Our first case this morning is New Mexico Oncology and Hematology versus Presbyterian Healthcare Services. Uh, the case numbers are 19-2210 and 20-2024. Uh, counsel, uh, Mr. Sanders, uh, you may proceed. Thank you, your honor. May it please the court. My name is George Sanders and I represent the Plaintiff Appellant to NMOHC in this matter. The district court made four fundamental errors when it granted the defendant summary judgment motion in this case. First, it disregarded significant portion of the evidence that NMOHC had submitted in the summary judgment record. Two principal examples are the expert report prepared by NMOHC's expert economist, Dr. Reif and its oncology expert, Dr. Stella. The second is the court made factual findings where in fact, disputed issues of fact exist. Counsel, counsel, can you slow down just a little bit? Yes, your honor. Sure. Sorry about that. Third, the court weighed evidence and made credibility determinations in a number of places. And finally, the court incorrectly characterized and treated NMOHC's claims as involving refusals to deal when NMOHC did not assert any refusal to deal claims. Counsel, could I, could I just pick up on your, your, your last point and ask you to elaborate on that? Um, and, and, uh, let me just put the question this way. Uh, why don't your, uh, Sherman section two claims hinge on a refusal to deal theory? Thank you, your honor. There are two primary claims that NMOHC has asserted. One is that defendants controlled referrals that were supposed to be freely made by employed positions. The fundamental error that the district court made with respect to the referral program was to characterize it as these referrals coming from Presbyterian, the corporate entity. Referrals do not come from the corporate entity. They come from physicians that are supposed to be made in consultation with a patient. Indeed, the evidence in the record shows that Presbyterian recognized that they could not legally control the referral decisions of their physicians under federal law. Those we're not saying that the violation of the federal law is supporting the antitrust claim, but those federal laws that say you, a corporate entity cannot control referrals, creates a baseline level of competition. That physicians are free to make decisions based on medical, their ethical obligation to their patient, to do what's in the best interest of their patient in consultation with the patient. We can't lose sight of the fact that the fundamental decision as to where you're going to get your care resides in the patient, not the physician, and certainly not in a corporate entity. And with respect to the mandate, the mandate is essentially akin to what time arrangement. This was not Presbyterian, not wanting to- Well, counsel, before you leave the referral point, just to make sure we're Why is it anti-competitive then for the Presbyterian doctors to be encouraged to refer their patients to Presbyterian oncology services? I mean, wouldn't your own doctor, I mean, wouldn't it make just as much sense for a New Mexico oncology doctor to refer a patient to the clinic, to the New Mexico oncology clinic? What's the difference? Well, NMOHC has never argued that Presbyterian did not have the right to encourage its own physicians. That's competition. And we certainly would welcome competition. But the evidence in the record is that Presbyterian prohibited external referrals. Presbyterian- Oh, they did not prohibit external referrals. The referrals may have decreased, but they were not prohibited in the record that I read. Well, Judge, the evidence shows that what happened is Presbyterian had first tried to acquire NMOHC and those efforts failed. At that point, Presbyterian embarked on a planning process. A meeting was held on July 1st by the top corporate leadership of Presbyterian to address the oncology market. And at that meeting, they specifically adopted an aggressive referral control program. Well, we wanted to find out where the referrals were going. No, this was the document. The planning leading up to that showed that they had two options. One option was to terminate NMOHC's contract, which they chose not to do. The other was to implement an aggressive referral control effort. Didn't they want you to terminate their agreement and you refused? No, we never wanted our agreement terminated. That's right. That's right. That agreement stayed in effect and the referrals may have decreased, but they were not stopped. Well, Judge, first of all, they had this meeting on July 1st where they expressly discussed putting in place an aggressive referral control program. And then the head of that program, Mr. West, prepared a document where he specifically wrote that internal referrals of capitated patients was a requirement. And the word requirement appears throughout this document concerning various different types of cancers, certainly concerning. It was Mr. West framed it as this is a requirement supported by Presbyterian's top leadership. Did they foresee any short term gains in this situation? Well, there is evidence that in fact, Presbyterian's own internal planning documents showed that it cost them, that they lost money treating fee for service patients. Now, because of a fiction of their accounting process, they view an internal transfer payment that's made by PMG, the provider to the health insurer as a cost. It's not a cost. An internal transfer payment is not a real cost. And Presbyterian has never actually presented any evidence that one, the cost for treating capitated patients is different from fee for service patients, nor have they ever done. I'm sorry. What evidence do you present? Well, we presented evidence from their own records showing that they actually lost money providing medical oncology services to these fee for service patients. And the only evidence defendants have provided concerning cost savings is that they don't have to make this payment, this internal transfer payment from the medical group back to the health plan. But that's not a real cost. And the only evidence on this issue was NMOAC's expert who testified in his report and his deposition that these are not real economic costs. So there is evidence that Presbyterian was not making money in connection with this. But the profit sacrifice test only applies if this is a refusal to deal. And it is not a refusal to deal. This was an interference with the referral process. And Presbyterian Mike West, who was put in charge of this program, expressly noted that these were, in fact, requirements put in place by the top leadership. And then there are later documents saying that they were implementing this referral control. We have an email from late 2011 where a Presbyterian doctor was complaining to Dr. Arundhato, the head of PMG, about the heavy handed tactics that Presbyterian was using to prevent referrals. This is not encouragement. Heavy handed tactics are not encouragement. The program prepared drafted by Mr. West does not talk about encouraging. It talks about a requirement. Well, you're not you're not attempting to raise a tying claim, are you? Well, a tying claim would be a section one thing. We did not assert a section one. But as this but as this court identified in Novell, conduct that falls within anti-competitive conduct that's identified under section one can form the basis of a section two claim. The mandate is defendants using their monopoly power over Medicare Advantage plans to force patients to purchase drugs from their own. You did not have to purchase and did not purchase from them. I'm sorry. This had nothing to do with NMOHC. Presbyterian put the requirement to purchase the drugs directly on its enrollee, the Medicare Advantage enrollees. The tie is if you want Presbyterian Medicare Advantage plans, the patient also would have to purchase their drugs from specialty pharmacy. Presbyterian. Wait a minute. I understood that the Medicare Advantage plans were sold by Presbyterian to consumers and there was no course of dealing with your client. It was a totally separate deal. Well, no, what is not correct? No, no, that's not entirely correct, Judge. Because what Presbyterian was doing is NMOHC is an approved provider in the Presbyterian Medicare Advantage plans. They have negotiated drug purchase reimbursement rates. Presbyterian did not renegotiate that contract. Instead, what it did is it made a benefit change that forced Medicare Advantage enrollees directly to purchase their drugs from the Presbyterian specialty pharmacy. The specialty pharmacy said we'll ship the drugs to NMOHC to then inject into these patients. And some other providers did have the drug shipped to them. Your people. Well, the only other cancer provider was HOA, which did not accept all of the drugs, did object, in fact, to this requirement. Then the undisputed evidence in the summary judgment record from NMOHC's expert, Dr. Philip Stella, is that NMOHC should not have accepted these drugs. This is a process called white bagging. It interferes with the care NMOHC provides to the patient and creates patient risk problems for a number of reasons that were also identified by Dr. McEnany in her deposition, which is also in the record. Defendants don't have any expert testimony or fact evidence that these claims about why NMOHC would not accept these drugs from the specialty pharmacy. Well, they gave reasons why they wouldn't accept it. They couldn't be they couldn't trust them, they said. Well, it's not that they just couldn't trust them, but we don't know for sure that we're going to get the drugs at the right time. We couldn't be sure that the drugs were handled in the right way. These drugs are not drugs you get over the counter. These drugs have to be handled in very specific ways. And NMOHC was not going to trust a specialty pharmacy that had no experience with oncology, did not have the same protocols that its drug suppliers had. And the undisputed evidence is that NMOHC, from its expert, did the right thing in not accepting the white bagging. Presbyterian wanted to force NMOHC to do to deal with its specialty pharmacy to accept these drugs and to inject them into its patients. NMOHC said no. That created significant disruption for its patients. But Presbyterian is the one that harmed its own enrollees with this tying arrangement so it could harm NMOHC. Tying arrangement now? Well, it's again to a tying arrangement. Well, what is it? You just said first that you're not doing a tying claim. And now you're saying, oh, yeah, it's just like a tying claim. Now, what is it? Well, we did not assert a section one tying claim. I know you did. But conduct that constitutes a tie can still form the basis of a section two claim, as this court in the Novell decision expressly stated. Well, are you not asserting a tying claim? Now, we're not asserting a section one claim. No, you said you were not attempting to raise a tying claim. Now you are. But conduct that constitutes a tie is the type of conduct that courts traditionally have held to be anti-competitive. Well, counsel, wasn't the mandate, that is, having the Presbyterian's Medicare Advantage patients use the Presbyterian pharmacy, wasn't that driven by a cost saving matter? And why would it be anti-competitive if that's the case? Well, there's no evidence that there were actually any real cost savings with respect to this. Their internal planning documents show that the primary source of savings were internal transfer payments that were being avoided. That's not a real cost saving from an economic perspective, as Dr. Reif testified to. And it's the unrebutted testimony in the record at this point. The other factor is that NMOHC's reimbursement rates from PHP are actually lower than the drug acquisition costs for most of the drugs that the specialty pharmacy was going to supply under the mandate. The only way Presbyterian... I thought that was without the 340B program. That's without the 340B program. That's right. And the 340B program can only be done in-house, couldn't it? Well, Presbyterian Specialty Pharmacy, our position is that they could not provide 340B programs under the mandate to NMOHC's patients. There are various requirements for this for this program to be satisfied. And internal documents of Presbyterian also questioned whether they could, their specialty pharmacy could in fact provide 340B prices under the mandate to NMOHC patients that were actually under treatment by NMOHC. So there is no clear evidence in the record. And in fact, the evidence seems to support the view that the mandate was not going to save on drug costs if the 340B program was not applicable. I thought there was evidence in the record that the acquisition costs were higher than the reimbursement payment paid if it went to without the 340B program. Yes, Your Honor, we cited that evidence in our briefs. OK. My understanding is that your monopolization claim concerns the health insurance market as the relevant market, is that correct? That's one of the markets, yes. Well, is it the market, is it the relevant market for your monopolization claim? I apologize, Your Honor, you're right. The monopolization claim is based on the market for health insurance, private health insurance sold to employees of Medicare Advantage. All right. What does the mandate have to do with the health insurance market? Well, first of all, the mandate was derived, the market power supporting the mandate came directly from the Medicare Advantage market to the mandate and the referral control efforts were part of a strategy to harm NMOHC. NMOHC, there's two market segments in. I just throw in one more thing that you can build into your answer. NMOHC is not a participant, is it, in the health insurance market? That isn't what that's not what they do. Well, first of all, Judge, the the issue of standing and antitrust injury, which which your question is going to, was not raised by the defendants. No, I'm not asking about standing. I'm saying, how can you make a claim for antitrust injury when the relevant market for the claim is health insurance, but you don't do health insurance? And there's two answers to that. First, the defendants did not raise antitrust injury in their summary judgment motion. So this was not briefed in the summary judgment record. But two, the harm caused NMOHC is the principal independent oncology provider. Presbyterians contracting practices in the insurance market have created two market segments. There's the Presbyterian market segment and the loveless market segment. By harming NMOHC, crippling it, putting it out of business would have also significantly harmed Blue Cross Blue Shield, which is at this point the only insurer in the loveless market segment. So this would have this adversely impacted competition in the health insurance market. Presbyterian strategy from Dr. Reeves testimony and the evidence in the record is they segmented the health insurance markets through contract, through the use of their monopoly power over inpatient hospital services to create two market segments, the Presbyterian market segment and the loveless. And if you're a health insurer, you have to pick one or the other. You cannot straddle both segments. By harming NMOHC, Presbyterian strategy was to make the loveless market segment as non-competitive as possible. One way to do that would be to strip that segment of one of its major oncology providers at this point. Loveless had tried to do a contract. You're out of time. If you want to wrap it up, you've got a final point. Go ahead. I know I can stop at this point. Thank you, Your Honor. All right. Thank you, counsel. Mr. Levy, if I'm pronouncing that correctly. And you are. Thank you. And good morning to the panel. Jeff Levy of Jones Day on behalf of the Appalachian Presbyterian. In 2007, after Presbyterian was unable to renegotiate its provider contract with the plaintiff or negotiate some other type of affiliation with the plaintiff, Presbyterian decided to enter the outpatient oncology market and is now trying to compete against the plaintiff. Presbyterian was and remains the new entrant in that market. And yet within five years, Presbyterian found itself a defendant in an antitrust lawsuit alleging that it was violating Section two of the Sherman Act. The district court was entirely correct in entering summary judgment and was candidly very conservative in doing so. Numerous decisions of this court and, of course, the Supreme Court make clear that Presbyterian has no obligation to deal with the plaintiff. No, I'm sorry, what was that last comment, no what? No obligation to deal with the plaintiff, its competitor. And yet Presbyterian continues to have a provider agreement with the plaintiff, has never canceled that agreement. The evidence from plaintiff is that it's their most profitable contract. And Presbyterian doctors continue referring patients to the plaintiff, there were questions along those lines to Mr. Sanders, plaintiff's expert report makes clear that Presbyterian continues to refer patients to the plaintiff. But I want to be clear, Presbyterian has the absolute right to encourage its employed physicians to refer patients who are members of Presbyterian's own health plan to see Presbyterian's own employed oncologists and to take other steps to save money for the organization. The case law, I must emphasize, it's especially strong from this circuit. The case law could not be more clear. As this court held in another health care case, the Four Corners decision in 2009, the Supreme Court has emphasized the general rule that a business, even a putative monopolist, as we are alleged to be, has no antitrust duty to deal with its rivals at all. So there's no factual dispute that prevented summary judgment here. Presbyterian had the absolute right to do what it did. The court in Four Corners was referring to the Supreme Court's decisions, of course, in Verizon versus Trinco 2007 or 2004 and Pac Bell versus Linkline, which is 2009. Two other decisions from this court entirely on point and controlling are the Christie Sports decision and the decision in Novell. They are very forceful in this area and they make it clear that a putative monopolist has no antitrust duty to deal, no duty to deal on particular terms with its competitor. And that's with respect to the attempted monopolization claim, that's where we are. Let me focus for a second on the monopolization claim. Judge Matheson, you're right. In the summary judgment briefing, the plaintiff in its opposition acknowledged that it did not seek damages associated with the health insurance market claim. Why? Because it's not a competitor in that market. They're a group of doctors. They don't sell insurance. And so our response and our reply brief in the district court was, well, if you're not there's no basis for you to have standing or to seek any recovery under a section two theory because you're not a member of the market. What the plaintiff then does in its brief to this court is to devote a lot of attention to the market power issues on section two, even though the district court actually did not grant summary judgment on the market power issues. So we then had just in the last 15 minutes, a number of questions on what's the legal theory. Let's be clear. Mr. Sanders was quite clear and the briefs are quite clear. This is not a refusal to deal case, even though plaintiff's brief relies very heavily on Aspen scheme and on Lorraine journal to refusal to deal cases. But the plaintiffs have disavowed that this is a refusal to deal case. Why have they done that? Because Presbyterian never refused to deal. Presbyterian still has a contract, still referred patients to NMOHC's doctors. So it's not a refusal to deal case. The rubric, and that's why I think the court asked the questions to plaintiff's counsel. The rubric does seem to be a refusal to deal, but the Supreme Court's case in Trinco, this court's case decisions in Four Corners and Novell. Indeed, the court wrote in Novell, purely unilateral conduct does not run afoul of section two because businesses are free to choose whether or not to do business with others and free to assign the prices they hope to secure for their products. So I'm not going to go through the refusal to deal stuff, but there was a question regarding time. Plaintiff argued in its opening brief that the so-called mandate was akin, their word, to a tying agreement. So we, in our opposition, said two things. One, it's not a tie. And we cited the court to the Klamath Lake decision, which is really right on point where the Ninth Circuit held that the availability of a pharmacy benefit and restrictions on where you can get that benefit, which is essentially the mandate, are not separate products, not capable of being tied. But we also noted that the word tying does not appear in the plaintiff's briefs at the district court. Not there. And so the argument of tying, if it is the argument that's being made, was clearly weighed. But in all events, there's no tie going on here. No evidence of two separate markets that were tied together unlawfully. Plaintiff gave the district court no evidence in support of that claim. Mr. Levy, somewhat related to your last point regarding waiver issues, if I understand your brief correctly, I think you've argued that New Mexico Oncology waived its arguments on That is correct. But I have a further question about those arguments. Would the referral policy and the joint venture be relevant to the health insurance market, which is the relevant market for that claim? So I don't think so. And the reason I'll say that is that the so-called, well, the referral, are you referring to the referral policy with respect to doctors? Yes. I do think there might be some argued relevance to that, to the monopolization claim. Yes. It's not made by the plaintiff in their opposition to the district court. But I could imagine possible relevance, if that's your question. But the referral policy is a policy. Well, let me address it head on this way. Plaintiff's counsel talked about internal transfers. And let me just explain what happens with a capitated patient. Presbyterian health plan has patients and they are capitated to the Presbyterian delivery system. So that means the Presbyterian is paying its own oncologists to treat Presbyterian health plan patients who have cancer. If a patient is referred by a Presbyterian employed physician to NMOHC, NMOHC has to get paid. It's not simply an internal transfer that occurs. We Presbyterian have to pay hundreds of thousands of dollars, as it turns out over time, millions actually over the years, because NMOHC wants to be paid if they see our patients. And so what we were trying to do was to reduce the amount that was being paid to NMOHC because we were already paying our own doctors to see these patients. Under Trinco and Four Corners and Novell, this is absolutely lawful conduct. Whether we were saving money and all of the evidence that was submitted, by the way, by both sides, reflected Presbyterian desperately trying to figure out how to save money. This is not forsaking short-term profits, which is what the cases refer to in a refusal deal context. This is a situation where NMOHC is charging money to see our patients, as they of course will, and Presbyterian trying to figure out how can we lose less money on our oncology patients. And what they did was that they opened their own oncology line of business in 2007. They built that business up so that it could compete against the plaintiff and over time, it encouraged, Presbyterian encouraged their primary care physicians and the other physicians who would refer to oncologists. They encouraged those physicians to keep those patients in-house, refer to our own employed physicians. This is not violating some right of a patient. A patient can go wherever they want and there's, the record is clear that some of them continue to go to the plaintiff, but we did want to encourage our patients to stay within our system because it costs us less to be able to do that. And the reason it costs us less is because we don't have to pay NMOHC out of our pocket to see those patients. They don't see those patients for free. You had, Your Honor, I think you had another question regarding the RAA joint venture. Did you want me to address that as well? Well, I guess the question is how that venture, how the arguments about the joint venture match up with the monopolization and the attempted monopolization claim, and whether, again, whether it's relevant to the monopolization claim. Well, I thought there was no joint venture. There was a Presbyterian RAA, RAA is a group of radiologists, and they did have a joint venture with respect to seeing, imaging x-rays for patients who might have cancer. Two things. One, the plaintiff did not reference it in the district court, the RAA joint venture with respect to its monopolization claim. So we do argue in our brief that it's waived and it should be waived. But the joint venture addressed radiation screening for cancer, primarily breast cancer. The plaintiff does not offer this service. So in the refusal to deal or whatever concept we're addressing, we were not excluding the plaintiff from a service they provide. They don't provide this particular service. Then there was one. Excuse me. I thought that Mr. Potts said he was not aware of any agreements creating a joint venture. Judge Kelly, that's exactly where I was headed. What Dr. Potts said was that he was not aware of any agreements between RAA and Presbyterian concerning referrals. Ah, okay. So no agreements whereby if the RAA doctors took an image, an x-ray and saw breast cancer, that RAA would agree only to refer those patients to Presbyterian. He was aware of no such agreements. There was not a single other piece of evidence in the record on that as the district court noted. Let me address one other thought. The referral management issue is one where the facts are not in dispute. There was a reference to a memo from Mike West in 2011 where there was a proposal that Presbyterian oncologist, but all of the evidence in the record was that that's not what happened. There were numerous doctors and numerous administrators who were deposed, each of whom said unambiguously, if a Presbyterian employed physician thought that the best care was with NMOHC, they were freely entitled to do that. But I want to be clear, the law does not impose an obligation to do that. And that's why the district court's decision was so appropriate. Let me just sum up because I think I have eight seconds. In our judgment, this is an antitrust case that never should have been filed. Presbyterian is entitled to hire its own oncologists to compete in the market against the plaintiff. They're entitled to ask their employed physicians to refer to their employed oncologists, and they're entitled to insist that patients who have insurance from Presbyterian's health plan buy their chemotherapy support drugs from Presbyterian. I'll close just by saying, as Judge Gorsuch wrote in the Novell joined, I might add by would risk reducing the incentive both sides have to innovate, invest, and expand. Results inconsistent with the goals of antitrust. Thank you. Thank you, counsel. I think we've exhausted the allocated time and then some, so we will consider the case submitted. Thank you both for your arguments this morning. Very much appreciated. Counsel will be excused and we will move on to our next case.